# COURT OF APPEALS
# DECISION
# DATED AND FILED

## November 9, 2022

Sheila T. Reiff
Clerk of Court of Appeals

# NOTICE

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2020AP2139**

**STATE OF WISCONSIN**

Cir. Ct. No. 2020CV126

## IN COURT OF APPEALS
## DISTRICT II

LEGACY ASSURANCE PLAN OF AMERICA, INC.,

    PLAINTIFF-APPELLANT,

V.

LABOR AND INDUSTRY REVIEW COMMISSION AND DEPARTMENT OF WORKFORCE DEVELOPMENT,

    DEFENDANTS-RESPONDENTS.

        APPEAL from an order of the circuit court for Washington County: SANDRA J. GIERNOTH, Judge. *Affirmed*.

        Before Gundrum, P.J., Neubauer and Grogan, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.  Legacy Assurance Plan of America, Inc., appeals an order affirming a decision of the Labor and Industry Review Commission (LIRC) holding Legacy liable for unemployment benefits for a Legacy sales representative, Carol Farrand.  Legacy claims LIRC erroneously found that: (1) Legacy was a statutory employer subject to Wisconsin Unemployment Insurance law; and (2) Farrand performed her services for Legacy as an employee, not an independent contractor.  We affirm.

## BACKGROUND

¶2    Legacy is a Florida-based business that offers estate planning services.  Carol Farrand was a sales representative for Legacy in Wisconsin from September 9, 2016, until January 12, 2017.  As a sales representative, Farrand met with potential clients to present and sell Legacy's estate planning services.  Farrand used Legacy's official services presentation and provided customers with Legacy's application and enrollment form.  Farrand earned a total commission of $4,450.00 for the services she provided Legacy in 2016 and $75.00 for the services she provided in 2017.

¶3    In 2017, Farrand filed a claim for unemployment benefits.  The Department of Workforce Development (DWD) determined that Legacy was subject to Wisconsin Unemployment Insurance law effective January 1, 2016, based on services Farrand performed as an employee of Legacy.  Legacy appealed and a hearing was held before an administrative law judge (ALJ) acting as an appeal tribunal.  At the hearing, a Teams Analyst for the DWD testified that the DWD's determination was based in part on an Employment Status Questionnaire completed by Legacy.  Richard Follett, the Regional Vice President for Legacy, also testified about the services Farrand provided and the terms of a

2

Representative Agreement that Farrand signed with Legacy on September 9, 2016. Farrand did not testify.

¶4      The ALJ affirmed the DWD's decision.  In a written order, LIRC affirmed the DWD with some modifications, concluding that:  (1) Legacy was a statutory employer subject to Wisconsin Unemployment Insurance law beginning January 1, 2016; and (2) Farrand performed her services as an employee, not an independent contractor, under WIS. STAT. § 108.02(12)(bm) (2017-18).[1]   The circuit court affirmed LIRC's decision.

## DISCUSSION

¶5      On appeal, Legacy renews the arguments it made before LIRC and the circuit court.  Specifically, Legacy claims LIRC erroneously found that: (1) Legacy was a statutory employer subject to Wisconsin Unemployment Insurance law; and (2) Farrand performed her services for Legacy as an employee, not an independent contractor.  We address each issue in turn.

A.      *Standard of Review*

¶6      We review LIRC's decision rather than that of the circuit court. *Gilbert v. LIRC*, 2008 WI App 173, ¶8, 315 Wis. 2d 726, 762 N.W.2d 671.  In the absence of fraud, LIRC's findings of fact are conclusive if they are supported by credible and substantial evidence.  *See* WIS. STAT. § 102.23(1)(a)1.; *Kowalchuk v. LIRC*, 2000 WI App 85, ¶7, 234 Wis. 2d 203, 610 N.W.2d 122.  Credible and substantial evidence is "relevant, credible, and probative evidence upon which

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

reasonable persons could rely to reach a conclusion." *Princess House, Inc. v. DILHR*, 111 Wis. 2d 46, 54, 330 N.W.2d 169 (1983). When determining whether credible and substantial evidence supports LIRC's factual findings, a court may not "substitute its judgment for that of [LIRC] as to the weight or credibility of the evidence." Sec. 102.23(6).

¶7    We review LIRC's "conclusions of law under the same standard [that] we apply to a circuit court's conclusions of law—de novo." *Tetra Tech EC, Inc. v. DOR*, 2018 WI 75, ¶84, 382 Wis. 2d 496, 914 N.W.2d 21. Although we no longer defer to administrative agency decisions, we give those decisions due weight. *See id.*, ¶78. "'Due weight' is a matter of persuasion, [and] not [one of] deference." *Id.* It affords "respectful, appropriate consideration" of LIRC's determination, while affording us "independent judgment in deciding questions of law." *Id.*

B.    *Statutory Employer*

¶8    Legacy claims that LIRC erroneously found that Legacy met the statutory definition of an employer subject to unemployment insurance obligations under WIS. STAT. ch. 108. As material, an employer is subject to Wisconsin Unemployment Insurance law under either of the following provisions in WIS. STAT. § 108.02(13):

> (e) Any other employing unit, except a government unit, shall become an employer as of the beginning of any calendar year if the employing unit:
>
> 1. Paid or incurred liability to pay wages for employment which totaled $1,500 or more during any quarter in either that year or the preceding calendar year;
>
> …

4

(f) Any employing unit which is subject to the federal unemployment tax act for any calendar year, or which, as a condition for approval of this chapter for full tax credit against the tax imposed by the federal unemployment tax act, is required, pursuant to such act, the social security act, or any other federal law, to be an employer, shall become an employer as of the beginning of such calendar year.

Section 108.02(13)(e)1. & (f). LIRC found that Legacy was a statutory employer under § 108.02(13) because: (1) Legacy paid Farrand for services in Wisconsin in 2016; and (2) Legacy was subject to federal unemployment law in Florida. These findings are supported by credible and substantial evidence.

¶9      The Record shows that Legacy paid $1,500 or more to Farrand in a calendar quarter. Farrand's commission report, which was submitted as an exhibit at the administrative hearing, lists payments Legacy made to Farrand from October 20, 2016, through January 12, 2017. For the fourth quarter of 2016, the report lists $7,775 in commissions and bonuses, and $3,325 in commission and bonus chargebacks, for a total amount paid of $4,450. An additional exhibit, Tax Form 1099-MISC, issued by Legacy to Farrand, provides that Farrand's income for 2016 was $4,450. Accordingly, Legacy is subject to Wisconsin Unemployment Insurance law under WIS. STAT. § 108.02(13)(e)1. because it paid more than $1,500 to Farrand as an employee during the fourth quarter of 2016.

¶10      The Record also shows that Legacy is subject to the Federal Unemployment Tax Act (FUTA). At the administrative hearing, Follett testified that Legacy was subject to Florida's unemployment insurance law. The definition of employer in the Florida statutes, FLA. STAT. § 443.1215(1)(a)1., conforms to

the definition of employer under FUTA, 26 U.S.C. § 3306(a)(1)(A) (2020).[2] *See also* **Reese Reemployment Assistance Appeals Comm'n**, 103 So. 3d 195, 197 (2012) (language in Florida unemployment provision "almost identical" to language in FUTA). Accordingly, because Legacy is subject to Florida's unemployment insurance laws, it is also subject to FUTA. *See id.* at 198 ("[O]ne of the purposes of the Unemployment Compensation Law is to cooperate with the federal government in the administration of controlling federal legislation so that the state, as well as private employers and their employees, can receive the benefits of this legislation."). This renders Legacy a statutory employer subject to Wisconsin Unemployment Insurance law under WIS. STAT. § 108.02(13)(f). We thus turn to the second issue, whether Farrand was an employee or an independent contractor.

### C.    *Employee vs. Independent Contractor*

¶11    Determining whether persons are employees for unemployment compensation purposes requires a two-step analysis. **Gilbert**, 315 Wis. 2d 726, ¶33. The first step is to determine whether the individual has performed services for pay. **Id.**; *see also* WIS. STAT. § 108.02(12)(a). Here, Legacy does not dispute that the DWD established Farrand performed services for pay. Therefore, Farrand is presumed to be an employee for purposes of unemployment compensation. *See* **Princess House**, 111 Wis. 2d at 65-66.

---

[2] FLORIDA STAT. § 443.1215(1)(a)1. defines an employer as "[a]n employing unit that … [i]n a calendar quarter during the current or preceding calendar year paid wages of at least $1,500 for service in employment."

The Federal Unemployment Tax Act defines employer as "any person who … during any calendar quarter in the calendar year or the preceding calendar year paid wages of $1,500 or more." 26 U.S.C. § 3306(a)(1)(A).

¶12 The second step is to determine whether the individual is exempt under WIS. STAT. § 108.02(12)(bm). *Gilbert*, 315 Wis. 2d 726, ¶33. Under this step, the burden shifts to Legacy to show that Farrand is exempt under both parts of the test in § 108.02(12)(bm): (1) Farrand performed her services free from Legacy's control or direction; and (2) Farrand had an independently established business, or what is referred to as "economic independence and entrepreneurial risk." We address each part of the test in turn.

¶13 Under the first part of the test, Legacy must show both "by contract and in fact" that Farrand's services were "performed free from [its] control or direction." WIS. STAT. § 108.02(12)(bm)1. Section 108.02(12)(bm)1. provides five conditions to consider:

> a. Whether the individual is required to comply with instructions concerning how to perform the services.
>
> b. Whether the individual receives training from the employing unit with respect to the services performed.
>
> c. Whether the individual is required to personally perform the services.
>
> d. Whether the services of the individual are required to be performed at times or in a particular order or sequence established by the employing unit.
>
> e. Whether the individual is required to make oral or written reports to the employing unit on a regular basis.

Section 108.02(12)(bm)1.a.-e. Legacy does not dispute LIRC's determination that Legacy satisfied condition d., that Farrand was not required to perform her services at a particular time or in a particular order. Accordingly, we analyze whether Legacy has shown by contract and in fact that the remaining four conditions were met.

7

¶14    The first condition is whether Farrand was obligated to comply with instructions concerning how to perform the services. *See* WIS. STAT. § 108.02(12)(bm)1.a.  Legacy claims that there is insufficient evidence to support LIRC's finding that this condition was not met.  It argues that the Representative Agreement Farrand signed on September 9, 2016, did not provide any instructions on the means, method, or process for marketing or conducting sales solicitations. Rather, Legacy asserts that the Representative Agreement provided a limited number of general provisions that did not instruct Farrand on how to perform her services.  LIRC expressly found that this argument was "belied by the numerous requirements that Farrand had to follow that were contained in the Representative Agreement and Schedule A attached to the Representative Agreement."  This finding is supported by credible and substantial evidence.

¶15    Paragraph twenty-three in the Representative Agreement, titled Presentation Manual and Script, "required" Farrand to use Legacy's "official services presentation" and "include [a]ll disclaimers … in every presentation" to prospective customers.  It further instructed that Farrand was "strictly prohibited" from "us[ing], produc[ing], or distribut[ing] alternative presentation materials" and that "the only permissible modifications to the official presentation are the rearrangement of the pages to account for a representative's personality or delivery style and the addition of third-party publications (subject to prior approval by [Legacy] and actual probate records from their jurisdiction." Paragraph twenty-three made clear that if Farrand used, produced, or distributed an alternate presentation or failed to include all disclaimers, she could be immediately terminated.

¶16    The Representative Agreement also provided that Farrand "shall at all times abide by the procedures, polices, rules and regulations of [Legacy]

pertaining to such duties, including but not limited to the specific rules and regulations set forth in Schedule A to this Agreement." Under Schedule A, titled Rules and Regulations, Farrand was required to use the current application and enrollment form provided by Legacy; orally inform individuals of their right to cancel the Agreement as set forth in the Notice of Right to Cancel form; provide the customer with two copies of the Notice of Right to Cancel form; inform individuals of their right to consult with an independent attorney from Legacy's network or employ an attorney of their choice; and advise the customer that all applications were subject to approval by Legacy. Finally, in its response to the DWD's Employment Status Questionnaire, Legacy admitted that Farrand was required to "[a]dhere to policies or procedures regarding the services performed."

¶17 Legacy claims that this condition was met because Farrand was allowed to modify the sales presentation to account for her personality, delivery style, and the addition of third-party information. It claims this condition shows a "degree of flexibility" inconsistent with an employment relationship. We are not persuaded. This provision did not provide Farrand with a degree of flexibility sufficient to show Farrand was free from Legacy's control or direction. Under this provision, Farrand was only allowed to rearrange the pages of the presentation. She was still required to follow Legacy's official services presentation, use Legacy's application and enrollment form, and abide by Legacy's procedures, policies, rules, and regulations. LIRC's finding that Legacy failed to meet its burden on this element is supported by credible and substantial evidence.

¶18 The second condition is whether Farrand received training from Legacy with respect to the services performed. *See* WIS. STAT. § 108.02(12)(bm)1.b. Legacy claims that it did not provide training to Farrand on how to perform her sales presentation. It argues that any training Farrand received

was product orientation and unrelated to the sales services Farrand provided. Legacy further argues that it had no need to train Farrand on how to perform sales solicitation services because Farrand relied on her past experience as a business owner and outside sales person. LIRC rejected this argument, finding that the Representative Agreement required Farrand to complete Legacy's six-to-eight hour webinar training before performing her services for Legacy and complete all specialized training regarding Legacy's services and operations plans in its designated market. This finding is also supported by credible evidence.

¶19 Legacy's argument ignores the evidence that its training went beyond the estate planning products it offered to include training on its services, operational plans, and Farrand's duties. Paragraph three of the Representative Agreement provided that Farrand "shall complete all [Legacy] provided specialized training regarding [Legacy's] *services* and operational plans in its designated market." (Emphasis added.) Schedule A also required Farrand to complete Legacy's representative online training at the start of her employment and to participate in training "from time to time as [Legacy] provides *related to Representative's duties*." (Emphasis added.) Follett's testimony confirmed that Farrand was required to complete a six-to-eight hour webinar prior to her employment "to be familiar with the product, *services* and the company itself." (Emphasis added.) Finally, in its response to the DWD's Employment Status Questionnaire, Legacy admitted that it provided "instructions, training or orientation" for Farrand and that Farrand was required to "[c]omply with [Legacy's] *training or instructions on how to do the work*." (Emphasis added.)

¶20 The third condition is whether Farrand was personally required to perform the services. *See* WIS. STAT. § 108.02(12)(bm)1.c. Legacy claims that it met its burden on this condition because paragraph twenty-one of the

10

Representative Agreement allowed Farrand to outsource her services. It also points to Follett's testimony that Farrand was free to outsource various components of her services "anywhere from administration to marketing to scheduling appointments." We agree with LIRC that Legacy's argument ignores the plain language in paragraph twenty-one of the Representative Agreement which provides that Farrand could not authorize another person to perform her services unless she had Legacy's written consent:

> This Agreement may not be assigned by Representative without the written consent of [Legacy] and any attempt to make an assignment shall be void. Representative may not authorize any other person to act as a sub-representative under this Agreement, or to perform Representative's duties hereunder, without the written consent of [Legacy].

Under this provision, Farrand was required to personally perform her services for Legacy unless she obtained Legacy's express permission to do otherwise.

¶21 The last condition is whether Farrand was required to make oral or written reports to Legacy on a regular basis. *See* WIS. STAT. § 108.02(12)(bm)1.e. Legacy points to Follett's testimony that Legacy did not require oral or written reports to argue that it met its burden on this element. It claims the Representative Agreement required Farrand to submit successful customer applications to Legacy only if she wanted to get paid. Legacy argues that customer applications are not reports and that, even if the applications could be considered reports, they were not submitted on a regular basis because Farrand solicited thousands of prospective customers, but only produced fifteen applications for payment. LIRC rejected this argument because "the contract actually required Farrand to report all of her appointments, applications, and activities each day and mandated that all reports for the week be submitted by 11:59 p.m. on Sunday." Again, this finding is supported by the language in the Representative Agreement.

¶22 The clear language in Schedule A required Farrand to "report all activity, including but not limited to, appointments and applications, in [Lead Access Management] every day. The [Lead Access Management] reporting for the week must be completed no later than 11:59 pm Sunday." Additionally, in its response to the DWD's Employment Status Questionnaire, Legacy admitted that Farrand was required to "[m]ake regular oral or written reports to [Legacy] regarding the services performed." LIRC's finding that Legacy failed to meet its burden on this element is supported by credible and substantial evidence. *See **Tri-State Home Improvement Co. v. LIRC***, 111 Wis. 2d 103, 110-11, 330 N.W.2d 186 (1983) (employer exercised control in fact over sales representatives by making submission of checklist "prerequisite for payment of commissions"). Accordingly, as only one of the five conditions in WIS. STAT. § 108.02(12)(bm)1. was met, we conclude that Legacy did not meet its burden to show by contract and in fact that Farrand was free from Legacy's control or direction. We thus turn to the second part of the statutory test—economic independence and entrepreneurial risk.

¶23 To satisfy the second part of the test, whether the individual has an independently established business, or "economic independence and entrepreneurial risk," Legacy must prove "by contract and in fact" at least six of nine conditions:

> a. The individual advertises or otherwise affirmatively holds himself or herself out as being in business.
>
> b. The individual maintains his or her own office or performs most of the services in a facility or location chosen by the individual and uses his or her own equipment or materials in performing the services.
>
> c. The individual operates under multiple contracts with one or more employing units to perform specific services.

12

d. The individual incurs the main expenses related to the services that he or she performs under contract.

e. The individual is obligated to redo unsatisfactory work for no additional compensation or is subject to a monetary penalty for unsatisfactory work.

f. The services performed by the individual do not directly relate to the employing unit retaining the services.

g. The individual may realize a profit or suffer a loss under contracts to perform such services.

h. The individual has recurring business liabilities or obligations.

i. The individual is not economically dependent upon a particular employing unit with respect to the services being performed.

WIS. STAT. § 108.02(12)(bm)2.a-i. Legacy does not dispute LIRC's determination that Legacy satisfied the following conditions: (1) Farrand incurred the main expenses related to the services she performed under the contract (condition d.); (2) Farrand was obligated to redo unsatisfactory work for no additional compensation or was subject to a monetary penalty for unsatisfactory work (condition e.); and (3) Farrand may realize a profit or suffer a loss under the contract to perform such services (condition g.). Accordingly, we analyze whether Legacy has shown by contract and in fact whether the remaining six conditions were met.

¶24 The first condition is whether Farrand advertised or otherwise affirmatively held herself out as being in business. *See* WIS. STAT. § 108.02(12)(bm)2.a. Under this condition, a truly independent contractor will advertise or hold out to the public, or at least to a certain class of customers, the existence of an independent business. *See **Keeler v. LIRC***, 154 Wis. 2d 626, 633, 453 N.W.2d 902 (Ct. App. 1990). Legacy argues that this condition was met

because Farrand advertised and affirmatively held herself out as an independent sales representative. As proof, it points to Follett's testimony that Farrand performed her services "[u]nder her own name," and developed her own marketing strategy. Legacy also alleges that Farrand advertised her services using direct mail flyers that did not identify Legacy or provide any connection with Legacy.

¶25    LIRC found that Legacy did not meet its burden of proof because the flyers were for the performance of Farrand's services as a Legacy representative and not as an independent business. LIRC also noted that "Farrand did not testify, and there was no evidence that [Farrand] otherwise held herself out as being in business as a sales representative." LIRC correctly determined that Legacy did not meet its burden of proof on this condition. The only evidence in the Record concerning the flyers is Follett's testimony that Farrand advertised her services using "several thousand direct mail flyers … for delivery to potential customers." Follett did not testify about the content of the flyers and Legacy did not provide a copy of the flyer for the ALJ to view. Follett's testimony that Farrand used flyers to advertise her services, standing alone, is insufficient to establish that Farrand advertised the existence of an independent business.

¶26    The next condition is whether Farrand maintained her own office or performed most of the services in a facility or location chosen by her and whether Farrand was required to use Legacy's equipment or materials in performing her services. *See* WIS. STAT. § 108.02(12)(bm)2.b. The focus of this criterion is on "whether a separate business, i.e., an enterprise created and existing separate and apart from the relationship with the putative employer, is being maintained with the individual's own resources." *Gilbert*, 315 Wis. 2d 726, ¶39 (citation omitted).

We begin by looking at whether Farrand maintained her own office or performed her services in a location chosen by her.

¶27    LIRC determined that there was no evidence that Farrand maintained an office devoted to business purposes or that Farrand chose where she performed her services.    Legacy argues that this condition was met based on Follett's unrebutted testimony that Farrand performed her sales solicitation services at her home office or prospective customer's private homes.    It further claims that Farrand chose where to perform her services because she could decide which potential customers to visit.    These claims are not supported by the Record.    While Follett testified that Farrand "explained … that she worked out of her home," he admitted that he did not see her home office and was not sure whether Farrand used her equipment and materials for personal use:

> Q. [Y]ou said that she had a business phone[. D]o you know if that was also her personal phone number?
>
> A.  I do not. That was the number that she indicated as her business number[.]
>
> Q.  You indicated that you had her email account, the Hotmail account; do you know if that was also the same as her personal email?
>
> A.  I do not know.
>
> Q.  [Y]ou said that … you knew she had the internet, the computer, a printer, paper, phone, a vehicle; do you know if she had all those things before she began working for Legacy Assurance Plan?
>
> A.  From our conversations, some of her prior … job, I do specifically remember her telling me about her home office arrangement and how she worked out of her home, etcetera, um, in that capacity in that—that prior … with the prior employer.
>
> Q.  Do you know if she also used those items for her personal use?

15

A. I don't have any specific knowledge of that.

Legacy also fails to point to any evidence in the Record showing where Farrand actually conducted the sales presentations. Without more, Legacy failed to meet its burden to show that Farrand had a separate office or performed most of the services in a facility or location chosen by her. *See, e.g.*, *id.*, ¶41 (typical indicators of an existing business include maintaining an office, equipment, materials, and other facilities). We thus turn to the second part of this condition, whether Farrand used her own equipment or materials.

¶28 LIRC found that Legacy "required that Farrand use its materials in its presentation manual and forms to perform her services." Legacy claims that Farrand did not use any standardized forms to perform her sales solicitation because she simply provided Legacy's application to customers but she did not help customers complete it. Again, this claim is not supported by the Record. Legacy does not point to any evidence showing that the customers filled out the application. Moreover, in addition to Legacy's application, LIRC relied on Legacy's requirement that Farrand use its services presentation in finding this condition was not met. As we have seen in the section on control and direction, Farrand was "strictly prohibited" from using, producing, or distributing alternative presentation materials. Accordingly, LIRC's finding that Farrand was required to use Legacy's materials is supported by credible and substantial evidence.

¶29 The next condition is whether Farrand operated under multiple contacts with one or more employing units to perform specific services. *See* WIS. STAT. § 108.02(12)(bm)2.c. Legacy argues that this condition is met because

16

Legacy did not prohibit Farrand from operating under multiple contracts.[3] LIRC found that this was not sufficient to satisfy Legacy's burden. We agree. The plain language of § 108.02(12)(bm)2.c. provides that Legacy must prove by contract and in fact that Farrand "operate[d] under multiple contracts," not that Farrand *could* operate under multiple contracts. *See State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (we give statutory language its plain meaning). In this case, only one contract, the September 9, 2016, Representative Agreement between Legacy and Farrand, was presented and offered into evidence. Follett further testified that he did not know whether Farrand performed services under a contract with any other individual or entity during the period of time she performed services for Legacy: "I don't have the— any specific knowledge of that, one way or another. She certainly is not prohibited from doing that … but I don't have any specific knowledge one way or another as to whether or not she did." Finally, in its response to the Department's Employment Status Questionnaire, Legacy admitted that it had a single contract with Farrand. LIRC's finding that this condition was not met is supported by credible and substantial evidence.

¶30 The next condition is whether the services Farrand performed directly relate to Legacy as the employing unit retaining her services. *See* WIS.

---

[3] In making this argument, Legacy also relies in its reply brief on Farrand's Worker Status Questionnaire, which it labeled "Exhibit A." The DWD moves to strike Farrand's Questionnaire on the ground that it was not introduced into evidence at the administrative hearing. *See* WIS. STAT. § 108.09(7)(c)5.; *Kenwood Merch. Corp. v. LIRC*, 114 Wis. 2d 226, 236, 338 N.W.2d 312 (Ct. App. 1983) ("It is well established that reviewing courts are limited to the record …."). On appeal, our review is limited to the Record before LIRC. *See id.* Farrand's Questionnaire was not included in the Record before the LIRC. Accordingly we grant the motion to strike that portion of the reply brief, and we have not considered that document in deciding this appeal.

STAT. § 108.02(12)(bm)2.f. We previously held that the condition of integration is best explained by

> the example of a tinsmith called upon to repair a company's gutters when the company is engaged in a business unrelated to either repair or manufacture of gutters. Because the tinsmith's activities are totally unrelated to the business activity conducted by the company retaining his services, the services performed by the tinsmith do not directly relate to the activities conducted by the company retaining these services and these services were therefore not integrated into the alleged employer's business.

*Keeler*, 154 Wis. 2d at 633. Legacy argues that there is a tangential division between Farrand's services as a sales representative and Legacy's business of providing estate planning services because Farrand does not provide estate planning services while Legacy is not in the sales business. LIRC rejected this argument, finding that Farrand's services "directly relate to providing the clients for Legacy's estate planning services." This finding is supported by credible and substantial evidence.

¶31 At the administrative hearing, Follett testified that Farrand was selling the estate planning services that Legacy provides. As we have seen, the Representative Agreement required Farrand to use Legacy's services presentation and materials to sell Legacy's estate planning services. Legacy also admitted in the Department's Employment Status Questionnaire that Farrand was performing her services under Legacy's name. Accordingly, there is evidence that Farrand's sales presentation was integrated into Legacy's business of providing estate

planning services. Without Legacy's estate planning services, Farrand would have nothing to sell.[4]

¶32 We next look at whether Farrand had recurring business liabilities or obligations. *See* WIS. STAT. § 108.02(12)(bm)2.h. "This condition requires proof of a cost of doing business that the claimant would incur even during a period of time that he was not performing work for [the putative employer], such as office rent, professional or license fees, [or] liability insurance." ***Cortez-Robles v. Pro One Janitorial, Inc.***, Hearing No. 11403642AP (LIRC May 3, 2012).[5] Legacy argues that this condition was met because the indemnification clause in the Representative Agreement required Farrand to indemnify and hold Legacy harmless for liability arising from her services. It also asserts that Farrand paid for the recurring costs of the flyers and paid for her computer, printer, internet, telephone, vehicle, meals, paper, and office supplies. LIRC rejected this argument because there was no evidence to support Legacy's assertions and it "decline[d] to speculate that Farrand had these recurring business expenses or what they might

---

[4] Legacy relies on an unpublished opinion, ***Varsity Tutors LLC v. LIRC***, 2018AP1951, unpublished slip op. (WI App Oct. 15, 2019), to argue that Farrand's services are not directly related to its estate planning services. *See* WIS. STAT. § 809.23(3)(b) (unpublished case authored by member of a three-judge panel may be considered for persuasive value). ***Varsity Tutors*** is distinguishable. ***Varsity Tutors*** concluded that an online digital platform that connected tutors with students was not directly related to the services offered by one of its tutors. ***Id.***, No. 2018AP1951, ¶13. It reasoned that the tutor's activities were separate because the platform did not provide any tutoring services, did not train tutors, and did not assess the quality of the tutoring sessions or critique tutor performance. ***Id.*** In contrast, Farrand is selling the exact service Legacy is providing. Legacy also required Farrand to undergo training and, as found by LIRC in its written decision, Farrand was obligated to redo unsatisfactory work for no additional compensation and was subject to a monetary penalty for unsatisfactory work.

[5] Although LIRC's decisions are not binding authority, we may consider prior LIRC decisions on review. *See, e.g.*, ***Gilbert v. LIRC***, 2008 WI App 173, ¶10, 315 Wis. 2d 726, 762 N.W.2d 671.

have been." LIRC correctly determined that Legacy failed to meet its burden of proof on this condition.

¶33 The only evidence of recurring expenses in the Record is that Farrand paid $4,875 to purchase the flyers. This expense does not qualify as a business liability. Farrand would not have incurred this expense if she were not performing work for Legacy. *See id.* Aside from the flyers, Legacy did not present any evidence that Farrand had any recurring business liabilities or obligations related to the indemnification clause. It also failed to show that Farrand actually incurred expenses for her computer, printer, internet, telephone, vehicle, meals, paper, or office supplies. As we have seen, while Follett testified that Farrand worked from her home, he admitted that he did not see her home office and was not sure whether Farrand used her equipment and materials for personal use. *See **Ziburski v. Castforce Inc.***, Hearing No. 13202144EC (LIRC Nov. 22, 2013) (expenses must be for business purposes only).

¶34 The final condition is whether Farrand was economically dependent upon Legacy with respect to the services she performed. *See* WIS. STAT. § 108.02(12)(bm)2.i. We have long recognized that "economic dependence is not a matter of how much money an individual makes from one source or another. Instead, it refers to the survival of the individual's independently established business if the relationship with the putative employer ceases to exist." ***Larson v. LIRC***, 184 Wis. 2d 378, 392, 516 N.W.2d 456 (Ct. App. 1994) (citation omitted).

¶35 LIRC found that this condition was not met because the non-compete clause in the Representative Agreement prohibited Farrand "from engaging in similar work, so [Farrand] was not able to generate income in a similar sales representative capacity with any other entity, only Legacy." This

finding is supported by the terms of the non-compete clause in the Representative Agreement. Section B of the non-compete clause provides: "During the term of this Agreement, Representative agrees to offer the products and services available through [Legacy] and any associated companies only, and not for or on behalf of Representative's own account or for any other person, company, business, or entity." Additionally, under Section C(1), Farrand was prohibited "[f]or a period of two (2) years after the date of termination of this Agreement," from "sell[ing] or attempt[ing] to sell, whether on his own behalf or on behalf of any other person, company or entity, any financial or insurance products to a customer of [Legacy]."

¶36 Legacy claims that Farrand was not economically dependent on Legacy because Section C of the non-compete clause only prohibited Farrand from selling the financial or insurance products that Legacy sells. It argues that Farrand could continue operating her business because Farrand was free to sell other types of products or services to Legacy customers after her relationship with Legacy ended. Legacy does not point to any evidence in the Record, however, that Farrand performed as a sales representative for any other business or product. Accordingly, Legacy has not met its burden to show that Farrand had a viable independently established business that would continue to operate in the absence of her work with Legacy. Accordingly, as only three of the nine conditions in WIS. STAT. § 108.02(12)(bm)2. were met, we conclude that Legacy did not meet its burden to show by contract and in fact that Farrand had an independently established business.

21

## CONCLUSION

¶37 In sum, we conclude that LIRC's determination that Legacy is a statutory employer subject to Wisconsin Unemployment Insurance law under WIS. STAT. § 108.02(13) is supported by credible and substantial evidence. We also conclude that Legacy failed to satisfy the conditions required for Farrand to be considered an independent contractor under § 108.02(12)(bm). For these reasons, we affirm the circuit court's order.

*By the Court*.—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.